AUSA: Sarah Mortazavi

**24 MAG 2721**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **SEALED COMPLAINT** |
| v. | Violations of 18 U.S.C. §§ 1343 and 2 |
| NADER AL-NAJI, | COUNTY OF OFFENSE: NEW YORK |
| Defendant. | |

SOUTHERN DISTRICT OF NEW YORK, ss.:

      CHRISTOPHER YOUN, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

### COUNT ONE
### (Wire Fraud)

      1.      From at least in or about January 2021 up to and including in or about June 2021, in the Southern District of New York and elsewhere, NADER AL-NAJI, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, AL-NAJI, via interstate wire communications, executed a scheme to defraud a venture capital investment firm ("Investor-1") that purchased digital assets in the form of BitClout tokens of its money and property by falsely representing to Investor-1, in substance, that AL-NAJI's company did not have any control over the investment proceeds after the completion of the BitClout purchase, when, in fact, AL-NAJI, through his company, maintained control over the investment proceeds and used a substantial portion of such funds for his own benefit.

      (Title 18, United States Code, Sections 1343 and 2)

      The bases for my knowledge and for the foregoing charges are, in part, as follows:

      2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and I have been personally involved in the investigation of this matter. I have been a Special Agent with the FBI for approximately seven years. I have been involved in numerous investigations relating to violations of federal wire fraud, securities fraud, and related offenses.

      3.      The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources, including documents and information provided to me by others. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and

statements of others are reported herein, they are reported in substance and in part. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

## BACKGROUND

4.      Based on my review of marketing material provided to, and communications with, multiple venture capital firms, news articles, and other records, I have learned that NADER AL-NAJI, the defendant, is the founder of BitClout, a social media and cryptocurrency trading platform that purportedly allowed users to purchase BitClout tokens using Bitcoin, ostensibly through a decentralized protocol, without any centralized issuer, for the purpose of trading BitClout tokens in connection with the social media profiles of other BitClout users.

5.      Based on my review of BitClout marketing materials, I have learned that BitClout held itself out as a "cross between a financial app and a social app." Specifically, BitClout was touted as "a social network built from the ground up as its own custom blockchain. It's not a company, it has no employees—it's just code and coins . . . . [W]e refer to BitClout as a 'protocol'—it is ultimately nothing more than an open-source piece of code running on machines all over the world. No company, just code and coins."

6.      Based on my review of bank account records, corporate documents, and other materials, I have learned that Intangible Holdings is a Delaware limited liability company with an address in Hoboken, New Jersey, which is wholly owned and controlled by NADER AL-NAJI, the defendant.

## THE SCHEME TO DEFRAUD

7.      Based on my review of email communications with Investor-1, notes taken of an interview an Investor-1 representative, and documents provided by Investor-1, I have learned the following, in substance and in part:

   a.      In or about January 2021, NADER AL-NAJI, the defendant, contacted representatives of Investor-1 to discuss the BitClout project and provided them with BitClout's marketing material.

   b.      On or about January 18, 2021, AL-NAJI met with representatives of Investor-1 and stated, in substance and in part, his intent to use the Bitcoin raised from selling BitClout to develop the BitClout protocol.

   c.      On or about January 27, 2021, AL-NAJI sent Investor-1 a proposed agreement for the purchase of BitClout tokens.

   d.      On or about February 2, 2021, Investor-1 sent a reply email to AL-NAJI, attaching proposed edits to the purchase agreement. The proposed edits included the insertion of a passage indicating that Intangible Holdings and AL-NAJI agree to use the proceeds of the BitClout token purchase to "support the development of the BitClout ecosystem and community."

   e.      On or about February 2, 2021, AL-NAJI sent an email replying to Investor-1's proposed modifications to the purchase agreement and attaching a further revised draft. AL-

NAJI stated, in substance and in part, "Regarding the paragraph on using the proceeds to support the development of BitClout, that is not something Intangible Holdings LLC can legally guarantee. [Intangible Holdings] is merely purchasing BitClout tokens from the protocol, and it does not have any control over the funds after this purchase is complete (it only has BitClout at this point). Imagine you paid a trader to acquire Bitcoin for you— that is basically what [Intangible Holdings] is in this scenario. In the same way that the trader would not be able to make you any guarantees about the Bitcoin network, so too [Intangible Holdings] cannot make any guarantees about the BitClout network."

8.  Based on my review of financial records, blockchain records, investor records, and my conversations with a financial analyst and representatives of the Securities and Exchange Commission, I have learned, among other things, that contrary to AL-NAJI's representations to Investor-1, AL-NAJI, through Intangible Holdings, did maintain control over the proceeds provided by Investor-1. Additionally, contrary to AL-NAJI's representations to Investor-1, AL-NAJI and Intangible Holdings used proceeds from Investor-1 for, among other things, personal expenses and gifts to AL-NAJI's family members. For example:

   a.  On or about February 5, 2021, three funds affiliated with Investor-1 entered into a final "Purchase and Custody Agreement" to purchase $3 million of BitClout tokens and wire transferred the purchase funds into a bank account in the name of Intangible Holdings (the "IH Bank Account") where the money was commingled with funds originating from other apparent purchasers of BitClout tokens. As of February 4, 2021, the IH Bank Account had a zero dollar balance.

   b.  From on or about February 8, 2021 through on or about February 16, 2021, AL-NAJI transferred all the funds in the IH Bank Account, including the funds remitted by Investor-1, via multiple wire transfers to an Intangible Holdings account at a foreign cryptocurrency exchange (the "IH Crypto Exchange Account"), where the funds were used to purchase Bitcoin.

   c.  From on or about February 16, 2021 through February 19, 2021, AL-NAJI transferred approximately 542 Bitcoin from the IH Crypto Exchange Account through one or more intermediate wallets, to a wallet used by BitClout to receive investor funds (the "BitClout Wallet").[1] Based on my review of open-source information regarding the approximate price of Bitcoin,[2] I have learned that the value of the Bitcoin transferred from the IH Crypto Exchange Account exceeded $25.5 million.

   d.  From approximately February 19, 2021 through February 20, 2021, AL-NAJI transferred approximately 252.5 Bitcoin from the BitClout Wallet back to the IH Crypto Exchange Account. Based on my review of open-source information regarding the approximate

---

[1] Prior to February 16, 2021, the BitClout Wallet hosted approximately 58 Bitcoin. Between on or about February 16, 2021 and February 19, 2021, an additional 12 Bitcoin were transferred into the BitClout Wallet from sources other than the IH Crypto Exchange Account.

[2] From my review of open-source information, I have learned that between on or about February 16, 2021 and on or about February 19, 2021, the price of Bitcoin ranged from $47,201.30 to $56,113.65.

price of Bitcoin,[3] I have learned that the value of the Bitcoin transferred from the IH Crypto Exchange Account exceeded $12.8 million.

    e.  On or about February 23, 2021, AL-NAJI sold nearly all of the Bitcoin in the IH Crypto Exchange Account and obtained approximately $13.45 million, which AL-NAJI transferred to the IH Bank Account. Prior to that transfer, the IH Bank Account balance was approximately $302,000.

    f.  Also on or about February 23, 2021, AL-NAJI transferred approximately $13.45 million from the California-based IH Bank Account to a brokerage account registered in AL-NAJI's name via wire transfer (the "AL-NAJI Brokerage Account"), which previously had an account balance of only approximately $112,198. The brokerage account was serviced by a bank located in New York, New York.

    g.  On or about March 1, 2021, AL-NAJI used a portion of the $13.45 million discussed in the preceding paragraph to request a wire transfer from the AL-NAJI Brokerage Account in the amount of $1 million to an account in his wife's name.

    h.  On or about March 1, 2021, AL-NAJI used a portion of the $13.45 million discussed in the preceding paragraph to request wire transfers from the AL-NAJI Brokerage Account totaling approximately $1,050,000 to three individuals who, based on my participation in this investigation, I believe to be developers hired by BitClout. From my review of records of the AL-NAJI Brokerage Account, I have learned that two of the three aforementioned wire transfers that AL-NAJI authorized were destined for banks located in New York, New York.

    i.  On or about March 17, 2021, AL-NAJI used a portion of the $13.45 million discussed in the preceding paragraph to request a wire transfer from the AL-NAJI Brokerage Account in the amount of $1 million to an account in his mother's name.

    j.  On or about June 8, 2021, AL-NAJI used a portion of the $13.45 million discussed in the preceding paragraph to request an international wire transfer from the AL-NAJI Brokerage Account in the amount of $500,000 to an account in the name of AL-NAJI's father-in-law.

  9.  Based on my review of documents and my participation in an interview of Partner-1, I believe that AL-NAJI's transfer of a substantial portion of investment proceeds to his wife, mother, and father-in-law was contrary to AL-NAJI's representations to Investor-1 regarding the use of investment proceeds. I also believe that AL-NAJI's representations regarding Intangible Holdings' lack of control over the investment proceeds following that entity's facilitation of the BitClout purchase were false.

  10.  Based on my review of an audio recording of a telephone call that took place on or about March 1, 2021 between NADER AL-NAJI, the defendant, and representatives of the Brokerage Firm, I have learned that AL-NAJI stated, in substance and in part, that the over $13

---

[3] From my review of open-source information, I have learned that between on or about February 19, 2021 and on or about February 20, 2021, the price of Bitcoin ranged from $50,937.28 to $57,505.23.

4

million received in the Personal Brokerage Account was a "gift from some family overseas" who "came into some money" and "essentially gave me . . . some of that."

WHEEFORE, I respectfully request that a warrant be issued for the arrest of NADER AL-NAJI, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

           *Christopher Youn (by VF with permission)*
           Christopher Youn
           Special Agent
           Federal Bureau of Investigation

Sworn to me through the transmission of
this Complaint by reliable electronic
means (telephone), this 26th day of July, 2024.

_____
THE HONORABLE VALERIE FIGUEREDO
United States Magistrate Judge
Southern District of New York

5